**AFFIDAVIT OF SPECIAL AGENT PETER MILLIGAN
IN SUPPORT OF AN APPLICATION FOR A COMPLAINT
<u>CHARGING MOUAD NESSASSI ET AL.</u>**

I, Peter Milligan, state:

## **INTRODUCTION**

1. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2009. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7). I am currently assigned to the Boston Group VI Field Office. As an ATF Special Agent, my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, and the use of firearms in drug trafficking crimes. I am a graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.

2. This affidavit is based on an ongoing, multi-agency investigation in to the criminal activities of a criminal organization known as "Primeiro Comando da Massachusetts" or "PCM," as well as related criminal associates. The agencies involved in the investigation include: the ATF; the Department of Homeland Security, Homeland Security Investigations; the Massachusetts State Police; the Malden Police Department; the Chelsea Police Department; the Somerville Police Department; the Middlesex Sheriff's Office; the Lowell Police Department; the Weymouth Police Department; and the Marlborough Police Department.

3. This affidavit is being submitted in support of a criminal complaint against Fernando DeOliveira ("DEOLIVEIRA"), Mouad Nessassi ("NESSASSI"), Fadwa Chimal ("CHIMAL") and Jennifer Romero ("ROMERO") for: alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5) (DEOLIVEIRA); engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A) (DEOLIVEIRA, NESSASSI,

CHIMAL, and ROMERO); distribution of 28 grams of more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (NESSASSI and ROMERO); and possession of an unregistered firearm (sawed-off shotgun) in violation of 26 U.S.C. § 5861(d) (NESSASSI).

4. The facts in this affidavit come from my review of records and/or reports, my training and experience, and information obtained from other agents, officers and witnesses. This affidavit is only intended to establish that there is probable cause for the requested complaint and does not set forth all of the facts in regard to this ongoing investigation.

## PROBABLE CAUSE

5. Federal and local investigators have been involved in the investigation of PCM for approximately seven months. The PCM investigation arose out of an investigation of illegal firearms trafficking in communities North of Boston. The initial stages of the investigation involved the use of two Cooperating Witnesses (hereinafter referred to as "CW-1"[1] and "CW-2"[2]) to purchase illegal firearms from individuals. These gun buys led to the identification of PCM because its members/associates were actively involved in illegally selling firearms. As

---

[1] CW-1 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CW-1's identity and have met with CW-1 personally. CW-1 has provided accurate, truthful, and reliable information to law enforcement, including the ATF and Homeland Security Investigations ("HSI") in the past and continues to do so to the present. CW-1 has a minor criminal history and no convictions. CW-1 is receiving money from the government and has been promised protection against retaliation, including possible relocation, upon disclosure of CW-1's cooperation with law enforcement. CW-1 is also seeking immigration assistance to remain in the United States.

[2] CW-2 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety. I am aware of CW-2's identity and have met with CW-2 personally. CW-2 has provided accurate, truthful, and reliable information to law enforcement, including the ATF and HSI, in the past and continues to do so to the present. CW-2 has no criminal history. CW-2 is receiving money from the government and has been promised protection against retaliation, including possible relocation, upon disclosure of CW-2's cooperation with law enforcement. CW-2 is also seeking immigration assistance to remain in the United States.

discussed below, one of the PCM members/associates identified pursuant to the investigation is DEOLIVEIRA, who worked with other PCM gang members/associates to illegally sell firearms.

**November 30, 2018 – Gun Deal**

6.	On November 29 and November 30, 2018, CW-1 had multiple communications with Rodrigo TEVARES regarding the purchase of a .32 caliber pistol. TEVARES engaged in other firearms sales involving admitted PCM members/associates. CW-1 and TEVARES agreed to do the deal on November 30 in Malden, MA. CW-1 and CW-2 were involved in the deal on November 30. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly. Surveillance personnel were assigned to the area of the Stop and Shop parking lot in Malden. The CWs were under constant surveillance by agents/officers during the operation. Prior to the actual deal, DEOLIVEIRA contacted CW-1 and confirmed that he would deliver the handgun for TEVARES. DEOLIVEIRA arrived in a black Mercedes. The CWs recognized DEOLIVEIRA as being part of a prior gun sale involving TEVARES on November 6 – DEOLIVEIRA acted as a look-out during the November 6 deal with TEVARES. DEOLIVEIRA got into the undercover vehicle and provided CW-2 with a pistol, extra magazines and a box of ammunition. During the deal, DEOLIVEIRA noted that he was delivering the gun for "Rodrigo" – i.e., TEVARES. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. At the meeting site, the CWs provided agents with a Kel-Tec, P-32, .32 caliber pistol (with an obliterated serial number), three magazines, 43 rounds of ammunition, and a black leather holster. Based on a review of the seized firearm by ATF, it was manufactured outside of

Massachusetts and, thus, traveled in interstate or foreign commerce. In addition, pursuant to a review of records of the Department of Homeland Security, DEOLIVEIRA is presently in the United States illegally and, therefore, prohibited from possessing a firearm and ammunition.

**December 20, 2018 – Gun Deal**

7. On December 19, 2018, CW-1 arranged to purchase three 9mm pistols from DEOLIVEIRA. DEOLIVEIRA sent text pictures of two Smith & Wesson 9mm pistols and a HiPoint 9mm pistol to CW-1. They agreed to meet at 7 p.m. at the Stop and Shop parking lot in Malden. DEOLIVEIRA told CW-1 that his source of supply for firearms was a woman. The deal did not go forward on December 19.

8. On December 20, CW-1 and CW-2 purchased a handgun through DEOLIVEIRA. Prior to the deal, CW-1 had numerous communications with DEOLIVEIRA. DEOLIVEIRA eventually provided CHIMAL with a cell phone number for CW-1. CHIMAL called CW-1 and a meeting was arranged at 31 Chatham Road, Everett, MA, to do a gun deal. CW-1 and CW-2 were involved in the deal. Prior to the controlled buy, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction. The CWs were also given sufficient currency to conduct the firearms deal. Surveillance personnel were assigned to the area of 31 Chatham Road. The CWs were under constant surveillance by agents/officers during the operation.

9. The CWs observed a black Mercedes arrive at the site.[3] DEOLIVEIRA and CHIMAL were in the Mercedes. DEOLIVEIRA got into the undercover vehicle, while

---

[3] Surveillance identified a black 2011 Mercedes Benz sedan, registered to FF Plastering Inc., 206

4

CHIMAL stood at the driver's window of the undercover vehicle. Surveillance officers drove past the undercover vehicle during the deal and observed CHIMAL standing at the driver's side window. Per the CWs, CHIMAL gave CW-2 a small bag of what appeared to be powder cocaine as a "gift." CHIMAL told the CWs that she could sell them five new handguns a week, and that the guns were "all clean" [not previously used in shootings] and "new." CHIMAL also stated that her brother (identified as NESSASSI) and his girlfriend (ROMERO) were bringing the guns for the deal.

10. NESSASSI arrived and made contact with the CWs – NESSASSI was identified as "Mo." NESSASSI got into the back seat of the undercover vehicle along with CHIMAL. NESSASSI told the CWs that they had sold two of the pistols earlier in the day and only had one left. They then discussed a deal involving the single pistol. During the conversation, NESSASSI discussed that he had been in trouble with the law before and was very careful.[4]

11. The CWs thereafter met with both ROMERO and NESSASSI in the undercover vehicle.[5] ROMERO stated that she had concerns about doing the deal in Everett. She also showed the CWs a pink pistol that she was carrying for protection. All parties thereafter agreed to do the gun deal at a parking lot in Malden. The deal was moved to the Stop and Shop parking lot in Malden. Surveillance observed the undercover vehicle arrive at the parking lot and also the gray Jeep, white Chevrolet, and black Mercedes arrive. CHIMAL, NESSASSI, and DEOLIVEIRA got into the undercover vehicle and a discussion ensued as to the transfer of the

---

Stackpole Street, Apt. 1, Lowell
[4] NESSASSI was previously investigated by the ATF in 2015 as NESSASSI illegally sold an ATF cooperating witness a handgun in Chelsea, MA – the firearms deal was facilitated by a member of the 18th Street gang, a violent, multi-national criminal organization.
[5] Surveillance had seen a gray 2006 Jeep Liberty, registered to an individual in Derry, New Hampshire, and a white 2013 Chevrolet Impala, registered to Jennifer Gissel Romero.

handgun. Based on the discussion, CW-1, NESSASSI, and DEOLIVEIRA exited the undercover vehicle and CHIMAL stayed in the vehicle. ROMERO then got into the undercover vehicle along with NESSASSI. ROMERO asked CW-2 if CW-2 was law enforcement and CW-2 stated that CW-2 was not. ROMERO then handed CW-2 a black plastic bag which contained a 9mm pistol – CW-2 observed that ROMERO was wearing rubber gloves when she did so. She also provided ammunition for the firearm which was inside a single rubber glove. CW-2 paid ROMERO for the firearm and ammunition. ROMERO told CW-2 that she had an "AR" for sale – referring to a type of assault rifle. CW-2 and ROMERO agreed to do business in the future. At the end of the deal, NESSASSI told CW-2 that if "anything goes wrong," he would go after CW-2. CW-2 ignored the threat.

12. The CWs thereafter drove to a prearranged meeting site. They were under surveillance from the lot in Malden to the meeting site. At the meeting site, the CWs provided agents with a HiPoint, C9, 9mm pistol (serial number P100481105), and sixteen rounds of ammunition. They also provided the agents with a small baggie of what appeared to be powder cocaine.

13. Following the above deal, CW-2 had numerous communications with CHIMAL in which they discussed CHIMAL providing CW-2 with firearms. In April, ROMERO and CHIMAL separately sent CW-2 the same text photo of what appeared to be a HiPoint, Model 995, 9mm, carbine rifle. CW-2 attempted to purchase the carbine from ROMERO on April 6, but they were unable to consummate the deal. Later in the week, CHIMAL sent the same text picture to CW-2 attempting to sell the carbine for $100 less than the price ROMERO had quoted CW-2.

### January 30, 2019 - Gun Deal

14. On January 30, 2019, CW-1 and CW-2 made a controlled purchase of a handgun and ammunition from NESSASSI in the parking lot of the Stop and Shop in Malden. After following the procedures described above, agents surveilled the CWs to the parking lot in Malden. NESSASSI and an unidentified female arrived in a blue Nissan sedan (registered to an individual at 200 Brookline Avenue, Apt. 503, Boston, MA). CW-2 purchased the handgun and ammunition from NESSASSI. At the meeting site, the CWs provided agents with a Taurus, PT-111 Millennium G2, 9mm pistol (serial number TKR64817) and twenty-four rounds of ammunition.

### February 7, 2019 – Gun Deal

15. On February 7, 2019, CW-1 and CW-2 purchased a 9mm pistol with an extended magazine from NESSASSI in Chelsea. Prior to the deal, NESSASSI and CW-2 engaged in several communications concerning the sale, and agreed to meet at a Home Depot parking lot in Chelsea.

16. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device malfunctioned and did not record the deal. Surveillance personnel were assigned to the area of the Home Depot parking lot in Chelsea. The CWs were under constant surveillance by agents/officers during the operation. NESSASSI arrived in a black vehicle. Prior to the deal, the black vehicle engaged in actions consistent with counter-surveillance to identify and/or foil possible law enforcement surveillance. NESSASSI got into the undercover vehicle and provided CW-2 with a pistol and

7

extended magazine. CW-2 paid NESSASSI for the handgun. CW-2 and NESSASSI discussed NESSASSI selling CW-2 an assault rifle. CW-2 also asked NESSASSI about obtaining crack cocaine (cocaine base) from NESSASSI. NESSASSI stated that he could "go and get" crack cocaine "right now." They agreed to do a deal later. NESSASSI did provide CW-1 with a small baggie of what appeared to be powder cocaine as a gift. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. At the meeting site, the CWs provided agents with a Glock, model 19, 9mm pistol (serial number MDP964), a 31-round extended magazine for the gun, and 29 rounds of ammunition in the magazine. Based on a review of records, the firearm was reported stolen in Florida in 2015. The CWs also provided agents with a small plastic baggie with a white powdery substance consistent with powder cocaine.

### February 15, 2019 – Gun and Cocaine Base Deal

17. On February 15, 2019, CW-1 and CW-2 purchased a 9mm pistol and over 29 grams of cocaine base from NESSASSI in Chelsea. Prior to the deal, NESSASSI and CW-2 engaged in several communications concerning the sale, and agreed to meet at a Home Depot parking lot in Chelsea.

18. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked and recorded the deal. Surveillance personnel were assigned to the area of the Home Depot parking lot in Chelsea. The CWs were under constant surveillance by agents/officers during the operation. Surveillance saw a greenish/blue Nissan Sentra, registered to an individual at 200 Brookline

Avenue, Apt. 503, Boston. NESSASSI then got into the undercover vehicle and provided CW-2 with a pistol and a plastic baggie with a substance consistent with crack cocaine. CW-2 paid NESSASSI for the handgun and the drugs. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. At the meeting site, the CWs provided agents with a Glock, model 19 (Gen 5), 9mm pistol (serial number BGPZ187), loaded with seven rounds of ammunition, and a baggie with a rock-like substance consistent with cocaine base. The drugs were sent to a government laboratory for analysis which resulted in the determination that there were over 29 grams of cocaine base in the baggie sold by NESSASSI.

### April 2, 2019 – Meeting With Romero Regarding Obtaining More Guns

19. On April 2, 2019, ROMERO (who was the source of supply for the December 20 firearm deal) met with CW-2 to discuss selling CW-2 additional firearms. The two met in a parking lot in Revere. Prior to going to the deal, CW-2 was equipped with a recording device which worked properly and recorded the meeting with ROMERO. Surveillance officers were able to identify a vehicle registered to ROMERO at the meeting site. ROMERO informed CW-2 that she had a source of supply for both firearms and cocaine. She further stated that she could get CW-2 "clean" handguns with "no bodies on them" – meaning that they had not been previously used in shootings. CW-2 and ROMERO thereafter discussed a 9mm pistol and AR-15 assault rifle that she could sell to CW-2. CW-2 and ROMERO negotiated a price for the two guns.

### April 9, 2019 – Gun Deal

20. On April 9, 2019, CW-1 and CW-2 made a controlled purchase of a sawed-off shotgun and a pistol from NESSASSI in Malden. CW-2 received electronic communications

9

from NESSASSI on April 9 in which NESSASSI offered to sell CW-2 the sawed-off shotgun and pistol. NESSASSI and CW-2 agreed to a price for the firearms and to meet at the Stop and Shop parking lot in Malden to do the deal that evening. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked properly and recorded the transaction with NESSASSI. Surveillance personnel were assigned to the area of the Stop and Shop parking lot in Malden. The CWs were under constant surveillance by agents/officers during the operation. Surveillance personnel observed NESSASSI arrive in a silver Mercedes sedan registered to an individual in Methuen. Surveillance observed NESSASSI make multiple trips between the Mercedes and the undercover vehicle. Per CW-2, NESSASSI initially brought the handgun into the undercover vehicle and then brought the sawed-off shotgun into the vehicle. NESSASSI asked for payment before he made a third trip for ammunition. During the buy, NESSASSI told CW-2 that NESSASSI could obtain a .40 caliber pistol from a source in Chelsea, and was prepared to sell it to CW-2. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. At the meeting site, the CWs provided agents with (1) a Mossberg, model 600AT, 12 gauge, sawed-off shotgun (with a barrel length of approximately 15 ½ inches) (serial number H624624), and fourteen rounds of 12 gauge ammunition, and (2) a HiPoint, JCP, .40 caliber pistol (serial number #X7149230), and seven rounds of .40 caliber ammunition.

**April 13, 2019 – Gun and Cocaine Base Deal**

21.     On April 13, 2019, CW-1 and CW-2 purchased a .357 caliber revolver and approximately 62 grams of cocaine base from ROMERO in Chelsea. Prior to the deal,

10

ROMERO and CW-2 engaged in several communications concerning the sale, and agreed to meet at the Market Basket parking lot in Chelsea.

22. Prior to the controlled purchase, ATF agents met with and searched the CWs for contraband with negative results. Agents equipped the CWs with a vehicle containing a recording device which recorded in both audio and video; the device worked and recorded the deal. Surveillance personnel were assigned to the area of the parking lot in Chelsea. The CWs were under constant surveillance by agents/officers during the operation. Surveillance officers were able to identify a vehicle registered to ROMERO at the meeting site. ROMERO got into the undercover vehicle and provided CW-2 with a revolver and a plastic baggie with a substance consistent with crack cocaine (cocaine base). CW-2 paid ROMERO for the handgun and the drugs. The CWs left the area, and were kept under surveillance as they proceeded to a prearranged meeting site. At the meeting site, the CWs provided agents with a Smith & Wesson, model 686-3, .357 revolver (serial number BEW3582), seven rounds of ammunition, and two baggies containing approximately 62 grams of a rock-like substance consistent with cocaine base.

## CONCLUSION

23. Based on the information described above, I have probable cause to believe that the defendants as identified above have committed federal crimes as identified above. In light of the defendants' association with firearms and involvement in drug dealing, I further request that agents/officers be allowed to execute any arrest or search warrants without knocking and announcing as such actions would potentially place executing agents/officers in danger.

Sworn to under the pains and penalties of perjury,

_____
PETER MILLIGAN
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me on  4/24/19

_____
HONORABLE M. PAGE KELLEY
United States Magistrate Judge